**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | Case No. 23-cr-57-CJW |
| vs. | | |
| | | **REPORT AND RECOMMENDATION** |
| MALACHI PATTON HANDLEY, | | **ON DEFENDANT'S MOTION TO** |
| | | **SUPPRESS** |
| Defendant. | | |

_____

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION...................................................................... 2

II.     FINDINGS OF FACT................................................................ 4

        A.      The sniff and the search .............................................. 4

        B.      Training and performance of Officer Smith and Lara ...................... 7

        C.      Mr. Potter's Opinions............................................... 9

III.    DISCUSSION....................................................................... 11

        A.      Parties' Arguments ................................................. 11

        B.      Relevant Law ...................................................... 12

        C.      Analysis........................................................... 14

                1.      Was there a search? ....................................... 15

                2.      Was there probable cause before the search?....................... 22

1

        3.     *Training and other issues raised by Mr. Potter*......................**26**

        4.     *Application of the exclusionary rule*..................................**28**

**IV.**    **CONCLUSION**..................................................................**33**

# I.   INTRODUCTION

On August 9, 2023, the Grand Jury returned an Indictment, charging Defendant with one count of Possession of a Firearm by a Felon, in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(8), and one count of Possession of a Stolen Firearm in violation of 18 U.S.C. Sections 922(j) and 924(a)(2).  (Doc. 3.)  The matter before me is Defendant's motion to suppress.  (Doc. 21.)  The motion was filed September 18, 2023, and contained an inventory of items to be suppressed.  (*Id*.)  The Government timely filed a response on September 25, 2023.  (Doc. 26.)  Defendant filed a reply on November 27, 2023.[1] (Doc. 39.)  The Honorable C.J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation.  I held a hearing on Defendant's motion to suppress on December 4, 2023.  (Doc. 41.)   The parties were afforded the opportunity to file post-hearing briefs.  The Government timely filed a post-hearing brief on December 11, 2023.  (Doc. 42.)  Defendant filed no post-hearing brief.

The motion arises from law enforcement's stop and subsequent search of Defendant's car.  Following an open-air sniff by drug dog Lara, law enforcement searched the vehicle and recovered a firearm.  At issue here is the timing and nature of

---

[1] A hearing on the motion to suppress was initially set for October 5, 2023.  (Doc. 23.)  On October 4, 2023, Defendant filed a motion to continue the suppression hearing for purposes of obtaining a canine expert.  (Doc. 28.)  The suppression hearing was reset to November 14, 2023.  (Doc. 34.)  On November 1, 2023, Defendant again requested a continuance of the suppression hearing, which was granted and reset to December 4, 2023.  (Doc. 35 & 36.)

Lara's behavior because she stuck her nose in the vehicle's open window without consent and before sitting; i.e., her final indication of the suspected presence of narcotics.

Defendant moves to suppress any evidence obtained from the allegedly unlawful search on March 4, 2023, including any statements which followed the unconstitutional intrusion into his vehicle. (Doc. 21.) Evidence he seeks to suppress includes: a firearm seized from his vehicle during the traffic stop and any statement Defendant made following the search of his vehicle. (*Id.*)

At the hearing, Government's Exhibit 1, was admitted without objection. The following Defendant's Exhibits were also admitted without objection:

A. Officer Bailey body camera video;

B. Officer Bailey body camera video;

C. Officer Bailey dash camera video;

D. Officer Bailey dash camera video showing dog at vehicle[2];

E. Aerial photograph from Google Maps;

F. Officer Bailey dash camera video;

G. Sgt. Clinton body camera video; and

H. Jerry Potter's resume.

The Government called Cedar Rapids Police Officer Tyler Smith. Officer Smith has been with the Cedar Rapids Police Department ("CRPD") for five years. He and Lara completed a month-long training course from the North Carolina kennel where Lara was acquired by the CRPD. Their ongoing training is described in more detail below. Defendant called his retained expert regarding dog handling and training, Jerry Potter. I found both witnesses credible even if I find certain facts that are not wholly consistent

---

[2] Defendant's Exhibit D-1 through D-10 were not formally offered at the hearing. However, they were provided to the Court and appear to merely contain still images from Exhibit D showing Lara near the door at the critical moment.

with their testimony. For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II. FINDINGS OF FACT

### A. The sniff and the search

Cedar Rapids Police Officers stopped Defendant's vehicle on March 4, 2023, because of a broken brake light. It was broad daylight and, although the temperature was not the subject of testimony, the participants in the stop seemed comfortable in shirt sleeves or light jackets.

Defendant was alone in his vehicle. Officer Bailey's[3] dash cam video shows Defendant's vehicle parked on the right-hand side of a road in a residential neighborhood. (Gov. Ex. 1, Bailey Patrol Vehicle Camera at 1:25.) Officer Bailey approached the driver's door and spoke to Defendant through the window. The window was down as Officer Bailey approached. (Def. Ex. A, Bailey Body Cam at 00:03, 17:39:52.) Officer Bailey explained Defendant was stopped due to a broken brake light. (*Id.* at 00:06, 17:39:55.) The discussion between Officer Bailey and Defendant reflects that at least Officer Bailey remembered Defendant from a prior encounter. Much of their conversation is immaterial to the Court's decision because there is no allegation that the officers prolonged the interaction or otherwise behaved in a manner that effects the legitimacy of the search. Nor is there any allegation that anything Defendant said created probable cause. Defendant denied the presence of drugs or a weapon in the vehicle. (*Id.* at 00:51-54, 17:40:40-43.)

The Government does, however, contend that Defendant was shaking inordinately during the interaction such that it contributed to the officers' suspicion about contraband in the vehicle. Officer Bailey and Officer Lodge observed Defendant "shaking like

---

[3] Unfortunately, not all the officers' full names are in the record.

crazy" or "like a leaf." (Gov. Ex. 1, Bailey Body Worn Camera ("BWC") at 12:28-31 and Lodge BWC at 2:38-40.) Defendant denied that he was shaking. The shaking is not visible on the video, but the officers' conversation reflects their contemporaneous observation of it.

When queried, Defendant denied he had smoked marijuana in the vehicle and told an officer that a dog would not alert to it. (Def. Ex. G, Clinton Body Cam at 00:03-00:07, 5:49:00-04 p.m.) Away from the vehicle and (and prior to the arrival of Lara) officers discussed their suspicion about the smell of marijuana. One officer[4] stated he detected a "hint of weed" but he admitted it was hard to tell. (Gov. Ex. 1, Bailey BWC at 12:26-28, 15:17-18; Lodge BWC at 7:19-27.) Another officer commented that it was difficult to pinpoint the source of the smell because of passing cars. (*Id.*, Lodge BWC at 7:31-38.) A third officer was also suspicious and could not determine if the smell was from Defendant's car or the nearby apartments. (*Id.*, Bailey BWC at 17:31-34; Def. Ex. G, Clinton Body Cam at 00:14-19, 5:49:12-17 p.m.)

Officer Tyler Smith, a canine handler with the CRPD was asked to report to where Defendant's vehicle was stopped by other officers. (Doc. 43 at 5.) Officer Smith's testimony was informed by his review of the body worn camera video from the events described below. Officer Smith had his dog Lara, a three-year-old, 75-pound Dutch Shepard, with him. Officer Smith and Lara were west of the vehicle about 15 to 20 feet when Officer Smith gave her a command to commence the open-air sniff. (*Id.* at 11, 73-74.) Officer Smith does not have a regular procedure for the "sniff" which could start or end at any point. (*Id.* at 74.) Officer Smith affixed a leash to her flat collar. Per his usual practice, he placed Lara in a sit and gave the command "sook" which directed Lara

---

[4] It seems likely this statement is attributable to Officer Bailey. Where more than in one officer is recorded on a body worn microphone, it is more difficult to identify the speaker.

to sniff.  Officer Smith testified that these steps allow Lara to understand the type of search she will perform.  (*Id.* at 6.)

Officer Smith observed changes in Lara's behavior after giving her the search command.  First, he noted closed-mouth breathing followed by an aggressive or quick pull toward the front grille of the suspect vehicle where Lara began to sniff.  (*Id.* at 11-12.)  Officer Smith then noticed Lara snap[5] her head back toward the driver's side of the vehicle.  Officer Smith testified, based on his observations during drug searches, that the snapping was caused by her efforts to return to a "scent cone" she had left.  (*Id.* at 12-13.)

When Lara reached the driver's wheel well area, Officer Smith noticed "a very aggressive sniffing pattern, closed-mouth sniffing pattern" which was inconsistent with her normal breathing through her mouth.  (*Id.* at 13.)  Lara then progressed beyond the vertical door seam between the driver's side front and rear doors.  Lara's head then snapped back again, this time up and to the left.  Officer Smith described the snap as an effort "to find the strongest source of odor."  (*Id.*)  Officer Smith testified that "if we could freeze time, I would have been able to articulate and say we had probable cause to search the vehicle when she snapped her head back to the vertical door seam and started going up to the window."  (*Id.* at 70.)

At this point Lara put her nose in the driver's window.  Officer Smith estimated that Lara's entire head did not enter the vehicle.  Rather, her nose went in approximately to her eyes; i.e., about 4-6 inches.  (*Id.* at 75.)  As highlighted in Defendant's Exhibits D-1 through D-10, Lara's back feet remained on the ground, but her front feet were on the outside of the driver's door as her nose was in the window.  I estimate from watching

---

[5] The testimony is replete with references to "snapping," although the term is not well explained on the record.  From the context of the testimony and the videos, a "head snap" seems to be a visible indication of the change in the dog's attention and/or direction of movement commencing with a sudden movement of the head.

the video counter that her nose was in the vehicle (i.e., beyond the plane where the window would be) for less than a second. (Def. Ex. D, Bailey Dash Cam at 00:13-00:14.) Lara then immediately sat. Officer Smith's body movement looks as though he intended to continue around the back of the vehicle, but Lara's sit appeared firm. (*Id.* at 00:15-00:22.) Officer Smith deemed this "an indication" of the presence of drugs and rewarded her with her ball as is his standard procedure. (Doc. 43 at 14.) After Lara retrieved her ball, she walked by the vehicle again and put her feet up on the driver's door and "jumped up into the window." (*Id.* at 14-15.)

Officers searched the vehicle and found the firearm at issue and a small amount of marijuana shake in the center console. (*Id.* at 68.)

## B.  *Training and performance of Officer Smith and Lara*

Lara is certified by the National Tactical Police Dog Association. No outside agency is charged with determining whether Lara passes standards set by the CRPD. (*Id.* at 16-17.) Lara is trained to find marijuana, methamphetamine, heroin, and cocaine, and has been working with Officer Smith on sniffs since approximately May of 2022. (*Id.* at 6.) Lara is also trained to do article searches, area searches for persons, and tracking searches for persons. (*Id.* at 6-8.) Each of these searches has a separate command.

The CRPD has a 16-hour monthly training requirement. (*Id.* at 19.) That requirement does not appear to require a dog to be actively training that entire time. (*Id.* at 19-26).

Officer Smith explained that, generally, he is summoned by fellow officers to perform a free air dog sniff when the officers have reasonable suspicion but not probable cause to for a vehicle search. (*Id.* at 46.) On the scene, officers share with Officer Smith their basis for suspecting the presence of drugs. (*Id.*) Officer Smith has declined to deploy Lara when he concluded reasonable suspicion was absent. (*Id.* at 47-48.) Officer Smith has not received formal training on how to prevent his own suspicions about the

7

presence of narcotics from influencing the search. (*Id.* at 48-49.) Lara has had false negatives in training. (*Id.* at 51-52.) That is, she has missed narcotics that were, in fact, present but hidden. (*Id.* at 52.)

For drug searches, Lara is trained to go to the strongest source of the odor. (*Id.* at 8.) When she has located the strongest source of the odor, she will indicate the presence of drugs by sitting or assuming a down position. (*Id.* at 10.)

Based on the parties' arguments, the most controversial aspect of this case is the significance of Lara's behaviors prior to her final indication. It should be noted that Officer Smith authorized the search of Defendant's car based on probable cause after Lara indicated by sitting. The significant question in this case (which arises from the fact that she "broke the plane of the window" before the final indication) is whether her pre-indication behavior and the surrounding circumstances amounted to probable cause thereby justifying her "search," i.e., the entry of her nose into the vehicle.

Officer Smith testified regarding his observations of her behavior prior to locating the strongest source of the smell. For example, he has on occasion observed aggressive leash pulling toward a certain area, head snapping back to a certain area, changes in direction, aggressive and/or localized sniffing, moving up or down, or pawing at a certain area during drug searches before the final indication. (*Id.* at 8-9.) He has not observed those changes of behavior for reasons other than smelling drugs. (*Id.* at 9.) Nor has he observed those changes of behavior when she was not "on the job." (*Id.*) These changes in behavior happen prior to an indication. (*Id.* at 66-67.) Lara has not given a final indication without having progressed through these changes in behavior. (*Id.* at 67.) These pre-indication changes of behavior vary among dogs and are not trained behaviors. (*Id.* at 33.) Officer Smith cannot recall ever authorizing a search based on Lara's behavior short of a final indication of sitting or lying down. (*Id.* at 38.) Officer Smith

does not use the term "alert" to indicate a change in behavior short of a final indication. (*Id.* at 38.)

Officer Smith does not routinely reward Lara for changes of behavior that fall short of a full indication, and he does not have a standard practice for doing so. (Id. at 27-28.) In a field situation (i.e., not merely training) Officer Smith does not reward Lara at the site of the sniff, if she does not indicate. (*Id.* at 28.) Officer Smith has not trained Lara to go through open vehicle windows, but he also does not attempt to prevent such behavior in the field or in training situations. (*Id.* at 41.) Officer Smith and Lara have received no training on whether she is permitted to sniff inside a vehicle. (*Id.* at 41-42.) Officer Smith believes Lara has previously sniffed inside (i.e., "broken the plane of the window") during field deployments previously. (*Id.* at 42-43.) Officer Smith has never authorized a search based on probable cause based on Lara's behavior short of a final indication.

On one occasion in March of 2023, Lara had shown signs of anxiety about not locating narcotics during training at a mock traffic stop where drugs were not present. (*Id.* at 15.) She seemed to want to sit to be rewarded, but she had not shown any changes in behavior before that point. (*Id.*)

Officer Smith was not able to say how far away Lara can detect marijuana, but he opined that 4 to 6 inches close would not have made any difference in her ability to detect it. (*Id.* at 75-76.)

## C.    *Mr. Potter's Opinions*

Jerry Potter was called to testify by Defendant. Mr. Potter has extensive experience in the military and as a commercial dog trainer and handler. While his experience is set forth in detail in Defendant's Exhibit H, I will note here that his dog-training experience dates to the 1990s and appears to include significant relevant experience in narcotics detection. He has testified on numerous occasions at the request

of criminal defendants.  Although he has not been called to testify on behalf of law enforcement, his resume notes that he has often provided feedback to attorneys that was favorable to law enforcement.  He authored a report that was shared with the Government at 4 p.m. on the Friday before the Monday, December 4, 2023, hearing.

Mr. Potter listened to Officer Smith's testimony and reviewed materials shared with him by defense counsel, including training records, deployment records, and standard operating procedure.  Mr. Potter's testimony included the following opinions:

1.     Mr. Potter was critical of Lara's participation in training.  While the CRPD requires 16 hours of training per month, Lara was not actively engaged in training to that extent.

2.     He believed Officer Smith should have approached the vehicle from a different direction given the prevailing winds on the day Defendant's vehicle was searched. [6]

3.     Even though Lara received a command to commence a search, she would still be smelling any odors that may be present and the behaviors Officer Smith attributes to her reaction to narcotics, may, in fact, be a reaction to other odors.

4.     Mr. Potter is concerned that "handler bias" could influence Lara and affect her behavior; however, he saw nothing in the videos that showed handler bias in this case.

---

[6] Mr. Potter testified that the prevailing winds were north-northwest.  "The true direction from which the wind is blowing at a given location (i.e., wind blowing from the north to the south is a north wind)."  https://forecast.weather.gov/glossary.php?word=wind%20direction.  This suggests that because Officer Smith and Lara approached the vehicle from the west he would not be approaching if from downwind which he opined is the ideal approach.  Officer Smith obviated this criticism by testifying that the wind was in his face when he approached the vehicle.  (Doc. 43 at 128.)  Thus, even if the winds were predominantly from the north-northwest on the day in question, Officer Smith's approach was consistent with the Mr. Potter's preference.

5.    Mr. Potter is concerned that the residual odor of narcotics from law enforcements interaction at a prior investigation could have contaminated the site and lead to a false positive.

6.    Mr. Potter counted only one "head snap" when Lara went from the front bumper back to the tire, not two as testified by Officer Smith.

7.    Mr. Potter's principal opinion at issue, however, concerns the significance of behavioral changes exhibited by a dog before a final indication.  Mr. Potter opined that a handler's interpretation of these pre-indication behavior changes is "purely subjective," as opposed to final indication, such as a sit, which can be objectively observed by anyone.  (*Id.* at 102.)  Mr. Potter had not seen any indication in the training records of Officer Smith ever evaluating Lara's behavior short of a final indication to determine if it was sufficient for probable cause.

### III.    DISCUSSION

#### A.    *Parties' Arguments*

Defendant asserts that when Lara put her nose in the window, law enforcement committed a physical intrusion on his effects for the purpose of gathering information within the meaning of the Fourth Amendment.  Defendant acknowledges that the Eighth Circuit has found no violation of the Fourth Amendment where a drug dog invaded a vehicle's interior.  *United States v. Lyons*, 486 F.3d 367 (8th Cir. 2007).  However, Defendant urges the Court to consider whether *Lyons* survived *United States v. Jones,* 565 U.S. 400 (2012) with its emphasis on the physical invasion of a defendant's property.  Defendant relies on *United States v. Buescher*, wherein Chief Judge Leonard T. Strand of this Court held that *Lyons* is not determinative of the issue, in light of subsequent rulings in *Jones* and *Jardines*.  No. CR23-4014-LTS, 2023 WL 5950124, at *8 (N.D. Iowa Sept. 12, 2023).

Defendant points to *United States v. Pulido-Ayala* and argues that it does not matter under the Fourth Amendment that a drug dog's trespass into a defendant's vehicle was instinctive because "[a] drug dog is an instrumentality of the police, and the actions of 'an instrument or agent' of the government normally are governed by the Fourth Amendment." 892 F.3d 315, 318 (8th Cir. 2018). Because the trespass was without probable cause, Defendant seeks exclusion of the evidence. Defendant further urges the Court that exclusion of the evidence is the appropriate sanction to deter future trespasses by untrained dogs.

The Government resists the motion on the bases that (1) probable cause existed before Lara's nose entered the open window; (2) the entry did not constitute a trespass; and (3) the evidence should not be excluded because law enforcement was entitled to rely on Eighth Circuit precedent that permitted the dog sniff. (Doc. 26 at 3.) More particularly, the Government asserts under *United States v. Holleman*, that Lara's behavior prior to her nose entering the window constitutes a sufficient "alert" that the absence of the ultimate "indication" prior to the entry is immaterial. 743 F.3d 1152 (8th Cir. 2014)

### B.   *Relevant Law*

The Fourth Amendment protects persons against unreasonable searches and seizures. U.S. Const. amend. IV. Warrantless searches are per se unreasonable, with a few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Id*. at 1140-41 (citations omitted); *see also United States v. Castaneda*, 438 F.3d 891, 893 (8th Cir. 2006) ("The warrantless search of a vehicle is constitutional pursuant to the automobile exception to the warrant requirement, if law enforcement had probable cause to believe

the vehicle contained contraband or other evidence before the search began.") (Quotation omitted)). The burden is on the Government to justify a warrantless search. *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984).

In *Wells*, the Eighth Circuit Court of Appeals articulated probable cause for searching a vehicle during a lawful traffic stop:

> "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir.2000). . . . "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). "[W]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (per curiam).

347 F.3d 280, 287-88 (8th Cir. 2003).

A dog sniff of the exterior of a vehicle during a stop does not violate the Fourth Amendment. *United States v. Rivera*, 570 F.3d 1009, 1012 (8th Cir. 2009) (citing *Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005)). "[A]n alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle." *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010); *see also United States v. Holleman*, 743 F.3d 1152, 1157 (8th Cir. 2014) (providing that "the handling officer testified [his dog] gave two definitive 'alerts' to the side of [the defendant's] truck" and "[a]s a result, we are not concerned about [the dog's] failure to give a full indication"); *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999) (holding that the positive indication of a reliable drug dog, alone, is enough to establish probable cause). A drug dog is considered reliable when it has been "trained

and certified to detect drugs and a detailed account of the dog's track record or education is unnecessary." *United States v. Olivera-Mendez*, 484 F.3d 505, 512 (8th Cir. 2007) (citation omitted). In explaining what is necessary to prove a dog's reliability the Supreme Court stated:

> [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

*Florida v. Harris*, 568 U.S. 237, 246-47 (2013). The standard to establish probable cause "is no more demanding where police search an automobile based on probable cause without a warrant." *Olivera-Mendez*, 484 F.3d at 512. However, the court must also consider evidence that may detract from the dog's reliability. *See Winters*, 600 F.3d at 967 ("Contrary evidence 'that may detract from the reliability of the dog's performance properly goes to the credibility of the dog.'") (Quoting *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994)). The relevant question is "whether all the facts surrounding a dog's alert [or indication], viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. at 248.

## C. *Analysis*

Officer Smith made two astute observations regarding interpretation of Lara's behavior:

> I wish the dog could tell me, but it's all on me to observe.

(Doc. 43 at 55.)

14

> [I]f we could freeze time, I would have been able to articulate and say that we had probable cause to search the vehicle when she snapped her head back to the vertical door seam and started going up to the window.

(*Id.* at 70.)

While there was limited evidence presented on these issues, I will take judicial notice of the facts that, at least in the Northern District of Iowa, dogs cannot talk, and we cannot freeze time. These limitations present a number of related challenges to resolving the instant motion.

### 1. Was there a search?

First, when Lara's nose entered Defendant's vehicle through the open driver's side window, was Defendant's right to be free of unreasonable searches violated? In *United States v. Lyons*, 486 F.3d 367 (8th Cir. 2007), law enforcement stopped a vehicle for speeding. *Id.* at 369. After speaking separately with the driver and passenger, and after the driver declined to allow the state trooper to search the vehicle, the trooper requested a K-9 unit. *Id.* at 370. The K-9 unit arrived, and the canine officer gave his dog the command to search, and they walked around the vehicle. *Id.* The front windows of the vehicle were open. *Id.* During the "initial trip around the van, [the dog] alerted several times and nearly indicated to the presence of narcotics" and on the "second lap around the van, [the dog] stuck his head through the open passenger-side window and then sat down beside the front passenger door, his indication that he had found the strongest source of the odor of narcotics." *Id.* The vehicle was searched, and law enforcement found 106 pounds of marijuana and $29,685 in cash. *Id.*

The defendants argued that the trooper that stopped their vehicle:

> created the opportunity for the dog to breach the interior of the vehicle because [the defendants] opened the windows as a direct result of the traffic stop, and that [the canine officer] improperly directed the canine into the vehicle's open passenger-side window.

15

*Id*. at 373.  The Eighth Circuit determined that:

> The district court did not err when it found that [the trooper who stopped the defendants] did not create the opportunity for the dog to breach the interior of the vehicle.  The district court found that [the passenger] opened the passenger window without any verbal order or request from [the trooper], and that there were no orders by [the trooper] to keep the windows open.  The video supports the district court's findings.

> [The defendants] do not cite to any authority that holds that the officers had the affirmative duty to close the windows in preparation for the dog sniff, and we find none. . . .

> Further, the district court's determination that [the canine officer] did not direct the dog to stick his head through the window of the van was supported by the evidence.  Absent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment.  *United States v. Reed*, 141 F.3d 644, 650 (6th Cir.1998); *United States v. Lyons*, 957 F.2d 615, 617 (8th Cir.1992); [*United States v.*] *Stone*, 866 F.2d [359,] 364 [10th Cir. 1989)].  [The canine officer] testified about his training and experience, and stated that he knew that he could not direct the dog to enter the vehicle without a warrant or the owner's consent.  He further testified that he directed the dog to sniff at various locations on the exterior of the van, but that when [the dog] stuck his head through the window, "That's on his own.  He was not directed inside the vehicle."  The district court found [the canine officer's] testimony to be credible, and that "the actions of [the officer] at that point in the sniff were not different because the window was open. . . ."

> The video . . . support[s] the district court's determination that the dog would have ultimately indicated on the van even if he had not stuck his head inside the window.  In *Lyons*, we found that when a dog's alert was inevitable, the sniff did not become an illegal search when the dog tore into a package and spilled out its contents.  *Lyons*, 957 F.2d at 617.  We stated, "Given the certainty that the course of action the police were pursuing at the time of the [dog sniff] would have led to discovery of the same evidence forthwith by unquestionably legal means, there is no reason to penalize the police for this accident by excluding evidence."  *Id*.

The district court found that "with the window open there is little doubt from the evidence here that [the dog] would have smelled the odor of the drugs in this case even if he had been reined back and held outside the plane of the window track." Further, the district court found credible [the canine officer's] interpretation of the dog's actions during the first lap around the vehicle as indicating that the odor was emanating from the vehicle. [The canine officer] explained that the dog continued sniffing until he found the strongest source of the odor, which was consistent with the dog's training. The district court concluded, "the open window would still have been the strongest source for the odor, and [the dog] would have indicated to that area of the vehicle, just as he did."

The video supports [the canine officer's] testimony, as it shows the dog alerting to several areas of the van and almost indicating at the rear of the van before ultimately sticking his head through the window. [The officer] can be heard on the video saying that the dog is smelling drugs "essentially everywhere." The fact that the dog stuck his head through the window does not change the result here.

*Id.* at 373-74 (fifteenth alteration in original).

Here, it appears from both the testimony and the video evidence that Lara's breaking the plane of Defendant's vehicle's window was an instinctive action. Further, Officer Smith did not direct Lara into the open window. Moreover, Officer Smith testified that Lara has not been trained "to go through open vehicle windows[.]" (Doc. 43 at 41.) Thus, under *Lyons*, there is no Fourth Amendment violation. 486 F.3d at 373 ("Absent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment.").

However, in *United States v. Pulido-Ayala*, 892 F.3d 315 (8th Cir. 2018), the Eighth Circuit called *Lyons* into question. In *Pulido-Ayala*, following a traffic stop, the defendant was asked to leave his vehicle prior to a free air dog sniff. *Id.* at 317-18. The defendant exited the vehicle and walked away from the car without shutting the door. *Id.*

at 318. The canine officer brought his dog to the rear of the defendant's vehicle and told the dog to:

> "find it"—the signal to begin the sniff—and the dog immediately pulled [the officer] toward the open door on the passenger's side. [The dog] jumped into the car through the opening and "alerted" (i.e., signaled the presence of drugs) at the fender area. [The officer] pulled the dog out of the opening and attempted to walk him clockwise around the vehicle. Again, [the dog] snapped his head back and went through the open door, alerting at the same location. Based on the canine's alert, officers searched the [vehicle] and found three kilograms of cocaine inside the fender of the vehicle.

*Id.* The Eighth Circuit noted that:

> Police ordinarily cannot search the interior of an automobile unless they have probable cause to believe that the vehicle contains contraband or other evidence of a crime. *California v. Carney*, 471 U.S. 386, 392, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985); *United States v. Ross*, 456 U.S. 798, 823, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). A drug dog is an instrumentality of the police, and the actions of "an instrument or agent" of the government normally are governed by the Fourth Amendment. *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). It is foreseeable that trained canines will react instinctively to the scent of drugs, and [the defendant] argues with some force that when police bring a dog to a scene with an open car door, and the dog enters a citizen's vehicle, the police have conducted a "search" within the meaning of the Fourth Amendment. *See United States v. Winningham*, 140 F.3d 1328, 1331 (10th Cir. 1998).

*Id.* at 318-19. The Eighth Circuit explained that:

> The district court thought the *Lyons* cases meant that "the officers' intent is dispositive," so that there was no search if [the dog] acted instinctively and [the canine officer] did not direct him to enter the car. But since the *Lyons* cases, the Supreme Court has emphasized that with two "limited exception[s]" for special-needs and administrative searches, the subjective intent of police officers is almost always irrelevant to whether an action violates the Fourth Amendment. *Ashcroft v. al-Kidd*, 563 U.S. 731, 736–37, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (internal quotation marks

omitted).  There is reason to doubt, therefore, whether the district court's reading of the *Lyons* cases endures.

*Id*. at 319 (second alteration in original).

Recently in *United States v. Buescher*, No. CR23-4014-LTS, 2023 WL 5950124 (N.D. Iowa Sept. 12, 2023), the district court questioned the ongoing viability of *Lyons's* reasoning.  In *Buescher*, a canine officer deployed his dog as follows for a free air sniff of a stopped vehicle:

> [The canine officer] led [his dog] around [the defendant's] vehicle three times (he testified he normally does two or three passes when conducting a drug sniff).  [The officer] and [his dog] followed their standard pattern by starting at the front passenger headlight and moving counter-clockwise around the vehicle.  [The officer] walked backward ahead of [the dog], who was on a four-foot leash.  [The officer] testified that on the first pass, [his dog] showed some interest at the driver's door (by smelling longer at that location) but did not provide a positive indication. . . .  According to [the officer], [the dog] did not alert or show interest in the [vehicle] on the second pass.  On the third pass, [the dog] put his nose in the open driver's window and tried to jump inside twice.  [The officer] testified this was an alert by [the dog] that he had found the odor of narcotics.  [The officer] prompted [his dog] to "find drugs" and [the dog] gave a positive indication by sitting down and staring.

*Id*. at *1 (quotation omitted).  The defendant argued that, based on *United States v. Jones*, 565 U.S. 400 (2012) and *Florida v. Jardines*, 569 U.S. 1 (2013), *Lyons* is no longer good law and the canine officer "conducted a warrantless search because [his dog] trespassed into a place law enforcement was not lawfully allowed to be without a warrant inside the open window) while intending to obtain information about [the defendant]." *Buescher*, 2023 WL 5950124, at *4.

Before discussing *Buescher* further, I will discuss the holdings in *Jones* and *Jardines*.  In *Jones*, the Supreme Court held that the installation of a GPS device on a target's vehicle, and using the GPS device to monitor the vehicle's movements constitutes

a search under the Fourth Amendment. 565 U.S. at 404. The Supreme Court explained that:

> It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a "search" within the meaning of the Fourth Amendment when it was adopted.

*Id*. at 404-05. In *Jardines*, law enforcement deployed a drug dog on the defendant's front porch without a warrant and the dog indicated at the base of the defendant's front door. 569 U.S. at 4. The Supreme Court held that the "government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' withing the meaning of the Fourth Amendment." *Id*. at 11-12. The Supreme Court explained that:

> The [Fourth] Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred. . . .
>
> That principle renders this case a straightforward one. The officers were gathering information in an area belonging to [the defendant] and immediately surrounding his house—in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

*Id*. at 5-6 (internal citations and quotation marks omitted). The Supreme Court further explained that:

> [A] police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do.
>
> But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no

customary invitation to do that. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police. The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose.

*Id*. at 8-9 (internal citations and quotation marks omitted).

Returning to *Buescher*, the district court observed that, "[b]ased on *Pulido-Ayala*, *Jones* and *Jardines*, it is not apparent that a canine's instinctive actions will never violate the Fourth Amendment." 2023 WL 5950124 at *7. The district court considered, "[i]f a police officer's intent is normally irrelevant to a constitutional inquiry . . . it is not clear why a canine's indiscernible motives would define the contours of an individual's right to be free from Government intrusion." *Id*. In considering *Jones* and *Jardines*, the district court noted:

Returning to *Jones* and *Jardines*, "[w]hen the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." *Jardines*, 569 U.S. at 5, 133 S.Ct. 1409. "It is beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment." *Jones*, 565 U.S. at 404, 132 S.Ct. 945. Intrusion may include a mere touching (such as the tracking device in *Jones*) or by exceeding a license to a place (such as the bringing a drug-sniffing dog to the curtilage of a home in *Jardines*). However, it must be accompanied by the intent to gather information.

*Id*. at *9. Applying these considerations to the facts in *Buescher*, the district court determined that:

[T]here is no doubt that a physical intrusion occurred. Indeed, before his final alert, [the dog] was actually dangling out of [the defendant's] window. . . .

> [The canine officer] himself would not have been constitutionally permitted to enter the vehicle without a warrant. *See California v. Carney*, 471 U.S. 386, 392, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). Similarly, [the dog's] entry into the open window was a trespass with an intent to obtain information. While canine sniffs enjoy *suis generis* status (*Caballes*, 543 U.S. at 409, 125 S.Ct. 834), they are not exempted from a trespass analysis under *Jardines*. As the *Jones* Court stated: "It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information." *Jones*, 565 U.S. at 404, 132 S.Ct. 945. The same conduct occurred here. As such, I find the Government conducted a warrantless and unreasonable search of [the defendant's] vehicle by allowing [the canine officer's dog] to insert his head into the open window of that vehicle.

*Id*.

As in *Buescher,* it is undisputed and the video evidence shows Lara's nose crossed the plane of the window before her final alert; and thus, a physical intrusion or trespass occurred. Also, like in *Buescher*, Lara's trespass was for the purposes of obtaining information. She had been given the command by law enforcement to seek narcotics and was actively engaged in that pursuit when her nose entered the window. Thus, under *Buescher*, I find that the Government conducted a warrantless and unreasonable search of Defendant's vehicle.

### 2.    *Was there probable cause before the search?*

The Government contends that, even if Lara's nose crossing the plane of Defendant's vehicle's window constitutes a trespass, "probable cause existed to search the vehicle before Lara's nose entered the vehicle window." (Doc. 26 at 4.) The Government asserts that Lara "alerted before jumping up to the open window." (*Id*. at 5.) In his testimony, Officer Smith noted various behavior changes in Lara prior to her final indication, which occurred after her nose entered the window. First, Officer Smith noted closed-mouth breathing followed by an aggressive or quick pull toward the front

grille of Defendant's vehicle where Lara began her sniff. (Doc. 43 at 11-12.) Officer Smith testified that he noticed Lara snap her head back toward the driver's side of the vehicle. According to Officer Smith, based on his observations during drug searches, the snapping of Lara's head was caused by her efforts to return to a "scent cone" she had left. (*Id.* at 12-13.) Next, when Lara reached the driver's side wheel well area, Officer Smith noticed "a very aggressive sniffing pattern, closed-mouth sniffing pattern" which was inconsistent with her normal breathing through her mouth. (*Id.* at 13.) Lara then progressed beyond the vertical door seam between the driver's side front and rear doors. Finally, Lara's head then snapped back again, this time up and to the left. Officer Smith described the snap as an effort "to find the strongest source of odor." (*Id.*) Officer Smith testified that "if we could freeze time, I would have been able to articulate and say we had probable cause to search the vehicle when she snapped her head back to the vertical door seam and started going up to the window." (*Id.* at 70.)

Officer Smith also testified generally regarding his observations of Lara's behavior prior to locating the strongest source of the smell of drugs. For example, Officer Smith stated that on occasion he had observed Lara engage in aggressive leash pulling toward a certain area, head snapping back to a certain area, changes in direction, aggressive and/or localized sniffing, moving up or down, or pawing at certain areas during drug searches before her final indication. (*Id.* at 8-9.) Officer Smith also testified that he has not observed such changes of behavior for reasons other than smelling drugs. (*Id.* at 9.) Nor has he observed those changes of behavior when Lara was not "on the job." (*Id.*) According to Officer Smith these changes in behavior happen prior to an indication. (*Id.* at 66-67.) Officer Smith testified that Lara has not given a final indication without having progressed through these changes in behavior. (*Id.* at 67.)

However, Officer Smith acknowledged that such pre-indication changes of behavior vary among dogs and are not trained behaviors. (*Id.* at 33.) Moreover, Officer

Smith could not recall ever authorizing a search based on Lara's behavior short of a final indication of sitting or lying down. (*Id.* at 38.) In the instant case, the entire free air sniff takes a total of six seconds before Lara makes her final indication. (Def. Ex. D at 00:10-00:16.) Significantly, the time from Lara's head snap toward the driver's side of the vehicle, through her progression from the wheel well to the vertical door seam, the snap to the left, and the sniff back up the door before placing her nose in the vehicle's open window takes approximately two seconds. (*Id.* at 00:12-00:14.) Lara then sits, making her final indication. (*Id.* at 00:15-00:16.) This entire process appears from the video to be a fluid progression lasting four seconds. I do not doubt that by freezing the video Officer Smith can credibly identify Lara's behavioral changes consistent with smelling drugs prior to Lara breaking the plane of Defendant's vehicle's window. Nevertheless, the events transpired quickly in real time and Officer Smith testified that he could not recall ever authorizing a search short of a final indication. These facts do little to support the Government's contention that the officers had probable cause to search the vehicle before Lara's nose entered the window.

Moreover, this case is distinguishable from *Pulido-Ayala*, where the Eighth Circuit determined that when the canine officer commanded his dog to find drugs, his dog "'immediately pulled [the officer] toward the open passenger door." 892 F.3d at 319. The Eighth Circuit determined that "[g]iven the strong reaction of the trained drug dog while it was *outside* the car, together with [the defendant's] suspicious reaction to the drug checkpoint, we conclude that police had probable cause to believe that the vehicle contained contraband in the moment *before* [the dog] actually crossed the threshold into the interior of the [vehicle]." *Id.* (emphasis in original). The Eighth Circuit found that "[t]he dog's reaction outside [the defendant's] car distinguishes this case from *Winningham*, where the court affirmed the suppression of evidence when a police dog moved around the exterior of a car, entered through an open door, and 'methodically

24

sniffed' the vehicle interior before alerting at a rear vent. 140 F.3d at 1330." *Id*. Here, unlike in *Pulido-Ayala*, Lara's head snaps and other behavior changes are not as strong as the dog in *Pulido-Ayala* "pulling" the officer toward the open passenger door. Even though Lara seems to have been progressing through behaviors that might have led to an indication, her behaviors were not nearly as strong as the actions of the dog in *Pulido-Ayala*. Additionally, in *Pulido-Ayala*, the other indicia of probable cause were much stronger. The defendant, while failing to follow common traffic laws, hastily exited the interstate at an exit with no amenities in response to approaching a mock drug checkpoint. *See id*. at 317.

In the instant case, there is only the possibility of Defendant shaking (which is not visible on the video) and the hint of the smell of marijuana, the source of which was unidentified, to otherwise support probable cause. Here also, Mr. Potter's concern about the subjectivity of the assessment of a dog's pre-indication behavior, as discussed below, is worth considering. At the time of the incident, Officer Smith appears to have relied upon Lara's final indication after Lara put her nose in the car. However, at the hearing, he was called upon after the fact to assess the presence of probable cause based on Lara's behavior in a way he had never done, i.e., without benefit of her final indication. In fact, he was asked to assess her behavior disregarding her definitive indication.[7] Bearing the foregoing in mind, I find that the evidence before me does not support a finding of probable cause that the officers could have relied upon to search Defendant's vehicle prior to Lara breaking the plane of the vehicle's open window.

---

[7] Nothing about this Report and Recommendation should be interpreted a criticism of Officer Smith or Lara. They both seem to have performed consistently with their training and CRPD policy. The sequence of events and the emerging Fourth Amendment law seem to have placed Officer Smith in an odd position to evaluate Lara's behavior.

### 3. *Training and other issues raised by Mr. Potter*

To the extent that Defendant raised the issue of Officer Smith's training and Lara's training in relation to *Florida v. Harris*, 568 U.S. 237 (2013) at the suppression hearing, I find that issue is waived as untimely under Federal Rule of Criminal Procedure 12(c)(3). Rule 12(c)(3) provides that "[i]f a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." *Id*. In neither his opening brief nor his reply brief does Defendant challenge Officer Smith's training or Lara's training under *Harris*. Although Defendant's expert, Mr. Potter, raised some concerns about how Lara was trained and handled, Defendant's motion did not assert Lara was inadequately trained and certified. The Government received Mr. Potter's report on the Friday before a Monday hearing. This is insufficient notice to the Government to reply to allegations about the adequacy of the training. Because Defendant has shown no good cause for failing to timely raise this issue in the motion to suppress, the issue of the sufficiency of Lara's training is waived.

Nevertheless, Mr. Potter's opinions do inform issues that were raised by Defendant, especially in the reply brief, regarding whether Lara's pre-indication behavior can appropriately be interpreted to substantiate probable cause for the search of Defendant's vehicle. Although I have already determined that the officers lacked probable to search Defendant's vehicle prior to Lara's final indication, I will briefly address the issues raised by Mr. Potter at the suppression hearing.

First, while Mr. Potter was critical of Lara's participation in training for the 16-hour monthly training requirement, this general concern does not affect the determination of probable cause. Second, Mr. Potter believed Officer Smith should have approached the vehicle from a different direction given the prevailing winds on the day Defendant's

26

vehicle was searched.[8]  Because Officer Smith's approach was consistent with the Mr. Potter's preference, this opinion does not affect the determination of probable cause. Third, Mr. Potter raised concerns of "handler bias" which could influence Lara and affect her behavior; however, he saw nothing in the videos that showed handler bias in this case.  Thus, this inchoate concern does not affect probable cause.  Fourth, Mr. Potter also raised concerns that the residual odor of narcotics from law enforcement interaction at a prior investigation could have contaminated the site and lead to a false positive.  This inchoate concern does not affect probable cause.  Fifth, Mr. Potter counted only one "head snap" when Lara went from the front bumper back to the tire, not two as testified by Officer Smith.  However, this inchoate concern does not affect probable cause.

Lastly, Mr. Potter opined that even though Lara received a command to commence a search, she would still be smelling any odors that may be present and the behaviors Officer Smith attributes to her reaction to narcotics, may, in fact, be a reaction to other odors.  In essence, he argues these untrained behaviors while perhaps consistent with Lara's prior behavior when she has detected narcotics, are not the trained behaviors that formally indicate the presence of drugs rather than a natural response to other stimuli. This is Mr. Potter's most relevant concern and it detracts from a finding of probable cause based on Lara's pre-indication change in behaviors.  In support of this conclusion, I reiterate the following statement from *Harris*:

> [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his *alert*.  If a bona fide

---

[8] Mr. Potter testified that the prevailing winds were north-northwest. ("The true direction from which the wind is blowing at a given location (i.e., wind blowing from the north to the south is a north wind)." https://forecast.weather.gov/glossary.php?word=wind%20direction.  This suggests that because Officer Smith and Lara approached the vehicle from the west he would not be approaching if from downwind which he opined is the ideal approach.  Officer Smith obviated this criticism by testifying that the wind was in his face when he approached the vehicle.  (Doc. 43 at 128.)  Thus, even if the winds were predominantly from the north-northwest on the day in question, Officer Smith's approach was consistent with the Mr. Potter's preference.

Case 1:23-cr-00057-CJW-MAR    Document 46    Filed 01/26/24    Page 27 of 33

> organization has certified a dog after testing his reliability in a controlled
> setting, a court can presume (subject to any conflicting evidence offered)
> that the dog's *alert* provides probable cause to search.

*Harris*, 568 U.S. at 246-47 (emphasis added).  I have no reason to doubt Officer Smith's testimony regarding his observations of Lara's behavior before she put her nose in the window.  However, *Harris* emphasized the certification and training as the basis to trust an ultimate alert.  Lara was trained to sit or lie down to indicate the presence of narcotics.  Under the circumstances presented, it strains credulity to suggest that her untrained responses prior to putting her nose in the window are an adequate substitute for the trained indication or that those responses can be and were, in fact, divorced from the indication that occurred after the unconstitutional intrusion in assessing probable cause.   I do not suggest that pre-indication behaviors of a drug dog can never form the basis for a probable cause determination.  Given the totality of the circumstances prior to Lara's intrusion into the vehicle, a reasonable person would not believe there is a fair probability that contraband or evidence of a crime would be found in the vehicle.

### 4.    *Application of the exclusionary rule*

The Government asserts that even if the search of Defendant's vehicle was illegal under the Fourth Amendment, the exclusionary rule should not be applied because the Eighth Circuit has never overruled *Lyons* and a reasonable officer could rely on the language in *Lyons* that "[a]bsent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment."  (Doc. 26 at 9, quoting *Lyons*, 486 F.3d at 373.)  Countering the Government's assertion, Defendant argues that "at the time of the search, existing precedent either barred drug dogs from trespassing into [Defendant's] car or had negated the holding of *Lyon*[*s*]."  (Doc. 39 at 4.)  Defendant maintains that "*Jones*, not *Lyons*, controls . . . Lara's conduct, and that to the extent the instant offense relied on out-of-date precedent, such reliance does not preclude application of the

exclusionary rule." (*Id.* at 6.) In response, the Government contends that *Jones* did not overrule Lyons and the "instinctive actions" language in *Lyons* that the Government relies upon "was not dependent on the reasonable expectation of privacy standard." (Doc. 42 at 3.) Specifically, the Government argues that in *Lyons*, the Eighth Circuit "distinguished between an officer's conduct and a dog's instinctive actions; this distinction is still valid, and it does not depend on whether a reasonable expectation of privacy analysis or a trespass analysis occurs." (*Id.* at 4.) The Government maintains that "officers in this case should not be faulted for conducting a search that was consistent with *Lyons*. The exclusionary rule should not be applied." (*Id.* at 6.)

In *Davis v. United States*, 564 U.S. 229 (2011), the Supreme Court addressed the issue of whether to apply the exclusionary rule "when the police conduct a search in compliance with binding precedent that is later overruled." *Id.* at 232. The Supreme Court held that "searched conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Id.* The Supreme Court noted that in "a line of cases beginning with [*United States v.*] Leon, 468 U.S. 897 [(1984)], we . . . recalibrated our cost-benefit analysis in exclusion cases to focus the inquiry on the "flagrancy of the police misconduct" at issue." *Davis*, 564 U.S. at 238. The Supreme Court stated:

> The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion "var[y] with the culpability of the law enforcement conduct" at issue. *Herring* [*v. United States*], 555 U.S. [135,] 143, 129 S.Ct. 695 [(2009)]. When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. *Id.*, at 144, 129 S.Ct. 695. But when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful, *Leon*, *supra*, at 909, 104 S.Ct. 3405 (internal quotation marks omitted), or when their conduct involves only simple, "isolated" negligence, *Herring*, *supra*, at 137, 129 S.Ct. 695, the " 'deterrence rationale loses much of its force,' " and exclusion cannot "pay its way," *Leon*, *supra*, at 919, 908, n. 6, 104 S.Ct.

29

3405 (quoting *United States v. Peltier*, 422 U.S. 531, 539, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975)).

*Id*. The Supreme Court explained that:

> The question in this case is whether to apply the exclusionary rule when the police conduct a search in objectively reasonable reliance on binding judicial precedent. . . .   Although the search turned out to be unconstitutional under Gant, all agree that the officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way. . . .
>
> Under our exclusionary-rule precedents, this acknowledged absence of police culpability dooms Davis' claim.  Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield "meaningfu[l]" deterrence, and culpable enough to be "worth the price paid by the justice system." *Herring*, 555 U.S., at 144, 129 S.Ct. 695.  The conduct of the officers here was neither of these things.  The officers who conducted the search did not violate Davis' Fourth Amendment rights deliberately, recklessly, or with gross negligence. *See ibid*.  Nor does this case involve any "recurring or systemic negligence" on the part of law enforcement. *Ibid*.  The police acted in strict compliance with binding precedent, and their behavior was not wrongful.  Unless the exclusionary rule is to become a strict-liability regime, it can have no application in this case.
>
> Indeed, in 27 years of practice under *Leon*'s good-faith exception, we have "never applied" the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct. *Herring*, *supra*, at 144, 129 S.Ct. 695. . . .
>
> Responsible law enforcement officers will take care to learn "what is required of them" under Fourth Amendment precedent and will conform their conduct to these rules. *Hudson* [*v. Michigan*], 547 U.S. [586,] 599, 126 S.Ct. 2159 [(2006)].  But by the same token, when binding appellate precedent specifically authorizes a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities.  An officer who conducts a search in reliance on binding appellate precedent does no more than "'ac[t] as a reasonable

officer would and should act'" under the circumstances. *Leon*, 468 U.S., at 920, 104 S.Ct. 3405 (quoting *Stone* [*v. Powell*], 428 U.S. [465,] 539–540, 96 S.Ct. 3037 [(1976)] (White, J., dissenting)). . . .

We have stated before, and we reaffirm today, that the harsh sanction of exclusion "should not be applied to deter objectively reasonable law enforcement activity." [*Leon*, 468 U.S.] at 919, 104 S.Ct. 3405. Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.

*Id*. at 239-41 (first and fifth alteration in original).

Here, *Pulido-Ayala* did not overrule *Lyons*. In fact, there is no Eighth Circuit case overruling *Lyons*. I note that Defendant contends that "*Jones*, not *Lyons*, controls." (Doc. 39 at 6.) However, *Jones* did not overrule *Lyons* and to the extent that *Pulido-Ayala* cast doubt on *Lyons*, it did not do so based on *Jones*. In fact, *Pulido-Ayala* does not even cite *Jones*. Further, while *Buescher's* reading of *Jones* and *Jardines* in light of *Pulido-Ayala* as it relates to *Lyons* is reasonable, it is not unreasonable to find *Jones* and *Jardines* distinguishable from *Lyons's* holding that "[a]bsent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." 486 F.3d at 373.

Neither *Jones* nor *Jardines* involved "instinctive actions." In *Jones*, law enforcement physically placed a GPS device on a target's vehicle to monitor the movements of the vehicle. Similarly, in *Jardines*, law enforcement physically directed the dog to the defendant's porch to sniff for drugs. In *Lyons* and in this case, law enforcement did not physically direct the dog into the defendant's vehicle. In both *Lyons* and in this case, the dog instinctively put its nose through the open window of a stopped vehicle. Furthermore, since *Jones* was decided in January 2012, other courts have relied on *Lyons* and its holding that "[a]bsent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." 486 F.3d at 373. *See United*

States v. Sharp, 689 F.3d 616, 620 (6th Cir. July 27, 2012) (holding that "a trained canine's sniff inside of a car after instinctively jumping into the car is not a search that violates the Fourth Amendment as long as the police did not encourage or facilitate the dog's jump"); *United States v. Chacon*, No. 4:23-cr-00064-SMR-WPK-6, 2023 WL 8364519, at *5 (relying on *Lyons* and finding that "there was no convincing evidence to show that the trooper directed the drug dog to make any physical contact with the vehicle" and "[a] review of the video footage instead supports the Government's position that the drug dog acted instinctively when the points of contact were made" and "[t]herefore, the drug dog unit's conduct during the open-air sniff did not infringe upon any Fourth Amendment rights").

This case is distinguishable from *Buescher* regarding the application of the exclusionary rule where the Government argued that the magistrate judge:

> correctly found no police misconduct, as [the canine officer] did not act unreasonably or improperly, but in lawful accordance with his (and [the dog's]) training. . . . Therefore, the Government concludes, no legitimate interests would be advanced by excluding the evidence. However, [the dog]—as an instrumentality of the Government—intruded on a constitutionally protected space. Not only had [the dog] done this previously, but [the officer] suggested [his dog] is actually trained to do so. As such, applying the exclusionary rule will afford meaningful deterrence in the form of updated training and practices concerning the need to avoid physical intrusions into the interior of a vehicle during a canine sniff.

*Buescher* at *10. Thus, *Buescher* did not address the arguments above regarding the officers' reliance on *Lyons's* continued viability. In addition, there is no evidence that Lara was trained to enter vehicles as was the dog in *Buescher*.

Finally, *Buescher* was decided on September 12, 2023. The traffic stop and dog sniff in this case occurred on March 4, 2023. It is indisputable that the officers in this case did not violate Defendant's Fourth Amendment rights deliberately, recklessly, or with gross negligence. *See Davis*, 564 U.S. at 240. Because at the time of the search of

Defendant's vehicle *Lyons* remained good law, "an officer who conducts a search in reliance on binding appellate precedent does no more than ac[t] as a reasonable officer would and should act under the circumstances." *Id.* at 241 (alteration in original) (quotation omitted). Accordingly, law enforcement could rely on *Lyons's* holding that "[a]bsent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." 486 F.3d at 373. Therefore, following *Davis*, I find that even if Lara's nose breaking the plane of Defendant's vehicle's window constitutes a trespass and an unreasonable and illegal search, the exclusionary rule should not be applied as *Lyons* remained good law and Officer Smith and the other officers acted in compliance with *Lyons*. *See Davis*, 564 U.S. at 241 ("Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.").

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 21.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 26th day of January, 2024.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa