# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-CR-57-CJW-MAR |
| Plaintiff, | **ORDER** |
| vs. | |
| MALACHI PATTON HANDLEY, | |
| Defendant. | |

## I. INTRODUCTION

This matter is before the Court on defendant's Motion to Suppress. (Doc. 21). The government filed a timely resistance. (Doc. 26). Defendant filed a timely reply. (Doc. 39). The Court referred defendant's motion to the Honorable Mark A. Roberts, United States Magistrate Judge, for a Report and Recommendation ("R&R"). On December 4, 2023, Judge Roberts held a hearing on the motion to suppress. (Doc. 41). During that hearing, Judge Roberts provided the parties with a deadline for optional supplemental briefing. (*Id.*). The government timely filed a supplemental resistance. (Doc. 42). On January 26, 2024, Judge Roberts recommended the Court deny defendant's motion to suppress. (Doc. 46). On January 30, 2024, defendant pled guilty to Count 1 via a conditional plea agreement, which preserved his right to appeal the motion to suppress. (Docs. 48; 49; 50; 53). Both parties timely objected to Judge Roberts' R&R. (Docs. 54 & 55). For the following reasons, the Court **overrules** defendant's objection, **overrules-in-part** and **sustains-in-part** the government's objections, **adopts-in-part** Judge Roberts' R&R, and **denies** defendant's Motion to Suppress.

## II. STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id*. If a party files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo. 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate [judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

## III. FACTUAL BACKGROUND

After reviewing the hearing transcript (Doc. 43), the Court finds that Judge Roberts accurately and thoroughly set forth the relevant facts in the R&R. The Court adopts Judge Roberts' summary of the facts here, with minor modifications as noted

below, to reflect clarifications to findings of fact. When relevant, the Court relies on and discusses additional facts in conjunction with its legal analysis.

### A. *The sniff and the search*

Cedar Rapids Police Officers stopped Defendant's vehicle on March 4, 2023, because of a broken brake light. It was broad daylight and, although the temperature was not the subject of testimony, the participants in the stop seemed comfortable in shirt sleeves or light jackets.

Defendant was alone in his vehicle. Officer Bailey's dash cam video shows Defendant's vehicle parked on the right-hand side of a road in a residential neighborhood. (Gov. Ex. 1, Bailey Patrol Vehicle Camera at 1:25.) Officer Bailey approached the driver's door and spoke to Defendant through the window. The window was down as Officer Bailey approached. (Def. Ex. A, Bailey Body Cam at 00:03, 17:39:52.) Officer Bailey explained Defendant was stopped due to a broken brake light. (*Id.* at 00:06, 17:39:55.) The discussion between Officer Bailey and Defendant reflects that at least Officer Bailey remembered Defendant from a prior encounter. Much of their conversation is immaterial to the Court's decision because there is no allegation that the officers prolonged the interaction or otherwise behaved in a manner that effects the legitimacy of the search. Nor is there any allegation that anything Defendant said created probable cause. Defendant denied the presence of drugs or a weapon in the vehicle. (*Id.* at 00:51-54, 17:40:40-43.)

The Government does, however, contend that Defendant was shaking inordinately during the interaction such that it contributed to the officers' suspicion about contraband in the vehicle. Officer Bailey and Officer Lodge observed Defendant "shaking like crazy" or "like a leaf." (Gov. Ex. 1, Bailey Body Worn Camera ("BWC") at 12:28-31 and Lodge BWC at 2:38-40.) Defendant denied that he was shaking. The shaking is not visible on the video, but the officers' conversation reflects their contemporaneous observation of it.

When queried, Defendant denied he had smoked marijuana in the vehicle and told an officer that a dog would not alert to it. (Def. Ex. G, Clinton Body Cam at 00:03- 00:07, 5:49:00-04 p.m.) Away from the vehicle and (and prior to the arrival of Lara) officers discussed their suspicion about the smell of marijuana. One officer stated he detected a "hint of weed" but he admitted it was hard to tell. (Gov. Ex. 1, Bailey BWC at 12:26-28, 15:17-18; Lodge BWC at 7:19-27.) Another officer

3

commented that it was difficult to pinpoint the source of the smell because of passing cars. (*Id.*, Lodge BWC at 7:31-38.) A third officer was also suspicious and could not determine if the smell was from Defendant's car or the nearby apartments. (*Id.*, Bailey BWC at 17:31-34; Def. Ex. G, Clinton Body Cam at 00:14-19, 5:49:12-17 p.m.)

Officer Tyler Smith, a canine handler with the CRPD was asked to report to where Defendant's vehicle was stopped by other officers. (Doc. 43 at 5.) Officer Smith's testimony was informed by his review of the body worn camera video from the events described below. Officer Smith had his dog Lara, a three-year-old, 75-pound Dutch Shepard, with him. Officer Smith and Lara were west of the vehicle about 15 to 20 feet when Officer Smith gave her a command to commence the open-air sniff. (*Id.* at 11, 73-74.) Officer Smith does not have a regular procedure for the "sniff" which could start or end at any point. (*Id.* at 74.) [The government clarified that "Officer Smith's testimony was about not having a procedure for how to take Lara around a vehicle, including the starting and ending point. However, Officer Smith did outline the procedures he followed for drug sniffs, article searches that did not involve searches for persons, area searches for persons, and tracking searches." (Doc. 55, at 1-2) (citing Transcript at 6-8).][1] Officer Smith affixed a leash to her flat collar. Per his usual practice, he placed Lara in a sit and gave the command "sook" which directed Lara to sniff. Officer Smith testified that these steps allow Lara to understand the type of search she will perform. (*Id.* at 6.)

Officer Smith observed changes in Lara's behavior after giving her the search command. First, he noted closed-mouth breathing followed by an aggressive or quick pull toward the front grille of the suspect vehicle where Lara began to sniff. (*Id.* at 11-12.) Officer Smith then noticed Lara snap her head back toward the driver's side of the vehicle. Officer Smith testified, based on his observations during drug searches, that the snapping was caused by her efforts to return to a "scent cone" she had left. (*Id.* at 12-13.)

When Lara reached the driver's wheel well area, Officer Smith noticed "a very aggressive sniffing pattern, closed-mouth sniffing pattern" which was inconsistent with her normal breathing through her mouth. (*Id.* at 13.) Lara then progressed beyond the vertical door seam between the driver's side front and rear doors. Lara's head then snapped back again,

---

[1] The Court has reviewed the transcript and agrees with the government's factual clarification. The government's objection providing factual clarification is sustained.

4

this time up and to the left. Officer Smith described the snap as an effort "to find the strongest source of odor." (*Id.*) Officer Smith testified that "if we could freeze time, I would have been able to articulate and say we had probable cause to search the vehicle when she snapped her head back to the vertical door seam and started going up to the window." (*Id.* at 70.)

At this point Lara put her nose in the driver's window. Officer Smith estimated that Lara's entire head did not enter the vehicle. Rather, her nose went in approximately to her eyes; i.e., about 4-6 inches. (*Id.* at 75.) As highlighted in Defendant's Exhibits D-1 through D-10, Lara's back feet remained on the ground, but her front feet were on the outside of the driver's door as her nose was in the window. I estimate from watching the video counter that her nose was in the vehicle (i.e., beyond the plane where the window would be) for less than a second. (Def. Ex. D, Bailey Dash Cam at 00:13- 00:14.) Lara then immediately sat. Officer Smith's body movement looks as though he intended to continue around the back of the vehicle, but Lara's sit appeared firm. (*Id.* at 00:15-00:22.) Officer Smith deemed this "an indication" of the presence of drugs and rewarded her with her ball as is his standard procedure. (Doc. 43 at 14.) After Lara retrieved her ball, she walked by the vehicle again and put her feet up on the driver's door and "jumped up into the window." (*Id.* at 14-15.)

Officers searched the vehicle and found the firearm at issue and a small amount of marijuana shake in the center console. (*Id.* at 68.)

### B. *Training and performance of Officer Smith and Lara*

Lara is certified by the National Tactical Police Dog Association. No outside agency is charged with determining whether Lara passes standards set by the CRPD. (*Id.* at 16-17.) Lara is trained to find marijuana, methamphetamine, heroin, and cocaine, and has been working with Officer Smith on sniffs since approximately May of 2022. (*Id.* at 6.) Lara is also trained to do article searches, area searches for persons, and tracking searches for persons. (*Id.* at 6-8.) Each of these searches has a separate command.

The CRPD has a 16-hour monthly training requirement. (*Id.* at 19.) That requirement does not appear to require a dog to be actively training that entire time. (*Id.* at 19-26).

Officer Smith explained that, generally, he is summoned by fellow officers to perform a free air dog sniff when the officers have reasonable suspicion but not probable cause to for a vehicle search. (*Id.* at 46.) On the scene, officers share with Officer Smith their basis for suspecting the

5

presence of drugs. (*Id.*) Officer Smith has declined to deploy Lara when he concluded reasonable suspicion was absent. (*Id.* at 47-48.) Officer Smith has not received formal training on how to prevent his own suspicions about the presence of narcotics from influencing the search. (*Id.* at 48-49.) Lara has had false negatives in training. (*Id.* at 51-52.) That is, she has missed narcotics that were, in fact, present but hidden. (*Id.* at 52.)

For drug searches, Lara is trained to go to the strongest source of the odor. (*Id.* at 8.) When she has located the strongest source of the odor, she will indicate the presence of drugs by sitting or assuming a down position. (*Id.* at 10.)

Based on the parties' arguments, the most controversial aspect of this case is the significance of Lara's behaviors prior to her final indication. It should be noted that Officer Smith authorized the search of Defendant's car based on probable cause after Lara indicated by sitting. The significant question in this case (which arises from the fact that she "broke the plane of the window" before the final indication) is whether her pre-indication behavior and the surrounding circumstances amounted to probable cause thereby justifying her "search," i.e., the entry of her nose into the vehicle.

Officer Smith testified regarding his observations of her behavior prior to locating the strongest source of the smell. For example, he has on occasion observed aggressive leash pulling toward a certain area, head snapping back to a certain area, changes in direction, aggressive and/or localized sniffing, moving up or down, or pawing at a certain area during drug searches before the final indication. (*Id.* at 8-9.) He has not observed those changes of behavior for reasons other than smelling drugs. (*Id.* at 9.) Nor has he observed those changes of behavior when she was not "on the job." (*Id.*) [The government elucidated that "Officer Smith's testimony was a clarification that he considered these specific actions 'changes of behavior' when Lara was 'on the job' and at other times; it was not a suggestion that Lara never aggressively pulled on the leash or took other actions when she was not working." (Doc. 55, at 2).].[2] These changes in behavior happen prior to an indication. (*Id.* at 66-67.) Lara has not given a final indication without having progressed through these changes in behavior. (*Id.* at 67.) These pre-indication changes of behavior vary among dogs and are not trained behaviors. (*Id.* at 33.) Officer Smith cannot recall ever authorizing a search based on Lara's behavior short of a

---

[2] The Court has reviewed the transcript and agrees with the government's factual clarification. To the extent the clarification is an objection, the government's objection is sustained.

6

final indication of sitting or lying down. (*Id.* at 38.) Officer Smith does not use the term "alert" to indicate a change in behavior short of a final indication. (*Id.* at 38.)

Officer Smith does not routinely reward Lara for changes of behavior that fall short of a full indication, and he does not have a standard practice for doing so. (*Id.* at 27-28.) In a field situation (i.e., not merely training) Officer Smith does not reward Lara at the site of the sniff, if she does not indicate. (*Id.* at 28.) Officer Smith has not trained Lara to go through open vehicle windows, but he also does not attempt to prevent such behavior in the field or in training situations. (*Id.* at 41.) Officer Smith and Lara have received no training on whether she is permitted to sniff inside a vehicle. (*Id.* at 41-42.) Officer Smith believes Lara has previously sniffed inside (i.e., "broken the plane of the window") during field deployments previously. (*Id.* at 42-43.) Officer Smith has never authorized a search based on probable cause based on Lara's behavior short of a final indication.

On one occasion in March of 2023, Lara had shown signs of anxiety about not locating narcotics during training at a mock traffic stop where drugs were not present. (*Id.* at 15.) She seemed to want to sit to be rewarded, but she had not shown any changes in behavior before that point. (*Id.*)

Officer Smith was not able to say how far away Lara can detect marijuana, but he opined that 4 to 6 inches close[r] would not have made any difference in her ability to detect it. (*Id.* at 75-76.)

### C. *Mr. Potter's Opinions*

Jerry Potter was called to testify by Defendant. Mr. Potter has extensive experience in the military and as a commercial dog trainer and handler. While his experience is set forth in detail in Defendant's Exhibit H, I will note here that his dog-training experience dates to the 1990s and appears to include significant relevant experience in narcotics detection. He has testified on numerous occasions at the request of criminal defendants. Although he has not been called to testify on behalf of law enforcement, his resume notes that he has often provided feedback to attorneys that was favorable to law enforcement. He authored a report that was shared with the Government at 4 p.m. on the Friday before the Monday, December 4, 2023 hearing. Mr. Potter listened to Officer Smith's testimony and reviewed materials shared with him by defense counsel, including training

7

records, deployment records, and standard operating procedure. Mr. Potter's testimony included the following opinions:

     1. Mr. Potter was critical of Lara's participation in training. While the CRPD requires 16 hours of training per month, Lara was not actively engaged in training to that extent.

     2. He believed Officer Smith should have approached the vehicle from a different direction given the prevailing winds on the day Defendant's vehicle was searched.

     3. Even though Lara received a command to commence a search, she would still be smelling any odors that may be present and the behaviors Officer Smith attributes to her reaction to narcotics, may, in fact, be a reaction to other odors.

     4. Mr. Potter is concerned that "handler bias" could influence Lara and affect her behavior; however, he saw nothing in the videos that showed handler bias in this case.

     5. Mr. Potter is concerned that the residual odor of narcotics from law enforcements interaction at a prior investigation could have contaminated the site and lead to a false positive.

     6. Mr. Potter counted only one "head snap" when Lara went from the front bumper back to the tire, not two as testified by Officer Smith.

     7. Mr. Potter's principal opinion at issue, however, concerns the significance of behavioral changes exhibited by a dog before a final indication. Mr. Potter opined that a handler's interpretation of these pre-indication behavior changes is "purely subjective," as opposed to final indication, such as a sit, which can be objectively observed by anyone. (*Id.* at 102.) Mr. Potter had not seen any indication in the training records of Officer Smith ever evaluating Lara's behavior short of a final indication to determine if it was sufficient for probable cause.

(Doc. 46, at 4-11).

## IV. ANALYSIS

In the Motion to Suppress, defendant argues officers lacked probable cause to search his vehicle because their only basis for searching—a K-9's alert to the presence of narcotics—was a trespass that occurred after the K-9's snout impermissibly entered defendant's vehicle, and items recovered from defendant's vehicle, thus, should be suppressed. (Doc. 21-3, at 2-4).

8

In his R&R, Judge Roberts recommended the Court deny defendant's motion. (Doc. 46). Judge Roberts found officers conducted a warrantless, unreasonable search because Lara's physical intrusion into the vehicle window was a trespass. (*Id.*, at 15-22). Judge Roberts also found there existed no independent probable cause to support a search before Lara's intrusion. (*Id.*, at 22-25). Next, Judge Roberts found defendant waived the issue of Officer Smith and Lara's training because the motion was untimely under Federal Rule of Criminal Procedure 12(c)(3), but Potter's opinion indicates Lara's untrained behaviors on these facts are an inadequate substitute for her trained indication. (*Id.*, at 26-28). Last, Judge Roberts found that despite the illegality of the vehicle search, the exclusionary rule does not apply. (*Id.*, at 28-33).

The government provided factual clarifications for three of Judge Roberts' findings of fact: (1) that Officer Smith testified that there was no procedure for drug sniffs; (2) that Officer Smith has not observed specific behavioral changes in Lara when she is not "on the job"; and (3) use of "final alert" instead of "final indication" in the R&R on page 22. (Doc. 55, at 1-2). As noted in the factual background, the Court reviewed the transcript and agrees with both factual clarifications, and they are consequently **sustained**. As to the third factual clarification, use of "final alert" instead of "final indication" in the R&R on page 22, the Court agrees with the government that "final indication" is the more appropriate term to use on page 22 in the R&R for consistency and **sustains** that clarification to the extent it is an objection.

Defendant objects to Judge Roberts' findings in the R&R that the exclusionary rule does not apply to the allegedly unreasonable search. (Doc. 54). The government objects to Judge Roberts' findings that (1) Lara's entrance into the window was an illegal search, and (2) officers did not have probable cause before Lara's entrance into the window. (Doc. 55, at 3-16). The Court addresses these objections in turn.

9

### A. *Whether a Search Occurred*

The government objected to Judge Roberts' legal conclusion that the government conducted a warrantless, unreasonable search of defendant's vehicle. (Doc. 55, at 3-7). The Court has done its own research and examination of this matter and agrees with Judge Roberts' findings and conclusions.

The Fourth Amendment protects persons against unreasonable searches and seizures. U.S. Const. amend. IV. The government's objection focuses on the following language in *United States v. Lyons*: "Absent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." 486 F.3d 367, 373 (8th Cir. 2007) (citations omitted). It is undisputed that Lara's nose crossed the plane of defendant's open vehicle window. Based on the testimony and video evidence (Doc. 43, at 34-41 & defense Exhibit D), it appears that this was an instinctive action.

Although *Lyons* has never been overruled, the Eighth Circuit called the *Lyons* decision into question in *United States v. Pulido-Ayala*, 892 F.3d 315 (8th Cir. 2018). In *Pulido-Ayala*, the Eighth Circuit stated that "[a] drug dog is an instrumentality of the police, and the actions of 'an instrument or agent' of the government normally are governed by the Fourth Amendment." 892 F.3d at 318 (quoting *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614 (1989). The Eighth Circuit then emphasized the important distinction between cases where the government has probable cause to search a vehicle *before* a dog enters the interior of a vehicle, based on the dog's strong reactions while outside the vehicle, and cases where the dog gives no strong reaction or final indication until *after* entering the interior of the vehicle. *Id.* at 319-20.

Under the Fourth Amendment, "'[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.' It is beyond dispute that a vehicle is an 'effect' as that term is used in the [Fourth] Amendment." *United States v. Jones*, 565 U.S. 400, 404 (2012). In *Jones*,

the Court found that a warrantless, unreasonable search occurred where police officers attached a GPS device to defendant's vehicle to monitor the vehicle's movements because the defendant had a right to be free from physical intrusion on their private property when the intrusion occurred "for the purpose of obtaining information." *Id.* "When 'the Government obtains information by physically intruding' on . . . effects, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Florida v. Jardines*, 569 U.S. 1, 5 (2013) (quoting *Jones*, 565 U.S. at 406 n.3). In *Jardines*, the Court found that a warrantless, unreasonable search occurred because police officers exceeded the scope of their license to defendant's porch by bringing a drug-sniffing dog and trespassing onto the curtilage of defendant's home. *Id.*, at 9. "The officers were gathering information in an area belonging to [defendant] and immediately surrounding [defendant's] house . . . And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by [defendant]." *Id.*, at 5-6.

In *United States v. Buescher*, this Court stated, "Based on *Pulido-Ayala*, *Jones*, and *Jardines*, it is not apparent that a canine's instinctive actions will never violate the Fourth Amendment." No. CR23-4012-LTS, 2023 WL 5950124 at *7 (N.D. Iowa Sept. 12, 2023). "Intrusion may include a mere touching (such as the tracking device in *Jones*) or by exceeding a license to a place (such as the bringing [of] a drug-sniffing dog to the curtilage of a home in *Jardines*). However, it must be accompanied by the intent to gather information." *Id.*, at *9. "If a police officer's intent is normally irrelevant to a constitutional inquiry, it is not clear why a canine's indiscernible motives would define the contours of an individual's right to be free from Government intrusion." *Id.*, at *7 (internal citation omitted). In *Buescher*, this Court found that a warrantless, unreasonable search of defendant's vehicle occurred. *Id.*, at *9. "[T]here is no doubt that a physical

11

intrusion occurred. Indeed, *before* his final alert, [the drug-sniffing dog] was actually dangling out of [defendant's] window . . . ." *Id.* (emphasis added).

Here, as in *Buescher*, this Court finds that a warrantless, unreasonable search of defendant's vehicle occurred. There is no doubt that a physical intrusion or trespass occurred. Indeed, *before* her final indication, Lara's nose crossed the plane of defendant's open vehicle window. Lara is an instrumentality of the police, and the government conducted a warrantless, unreasonable search by allowing Lara to insert her nose inside defendant's open vehicle window for the purpose of obtaining information short of a final indication.[3] Thus, the Court agrees with Judge Roberts that, under *Buescher*, the government conducted a warrantless, unreasonable search of defendant's vehicle.

The Court, therefore, **overrules** the government's objection on this ground.

### B.     Whether There was Probable Cause Prior to the K-9 Intrusion

The government objected to Judge Roberts' legal conclusion that the government did not have probable cause prior to Lara's entrance into the window. (Doc. 55, at 8-16). The Court has done its own research and examination of this matter and agrees with Judge Roberts' findings and conclusions.

The government's objection focuses on the following language in *United States v. Holleman*: "Some courts have held a trained drug dog's 'alert,' as opposed to the more conclusive 'indication,' is enough to establish probable cause. 743 F.3d 1152, 1156 (8th Cir. 2014) (citing *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009); *United States v. Clayton*, 374 F. App'x. 497, 502 (5th Cir. 2010)). In *Holleman*, the Eighth Circuit applied the framework adopted by the United States Supreme Court in *Florida v.*

---

[3] There is no dispute that, although Officer Smith has not trained Lara to go through open vehicle windows, Officer Smith does not attempt to prevent such behavior in the field or in training situations. Here, Officer Smith gave Lara the command to seek narcotics, and her nose entered the window short of a final indication, conduct that has not been prevented in the past nor here.

*Harris*, 568 U.S. 237 (2013), to determine whether a drug dog's sniff supported a conclusion that officers had probable cause to conduct a search. *Id.*, at 1157-58. Under the *Harris* framework, the inquiry is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test." 568 U.S. at 248.

Returning to *Holleman*, based on the totality of the circumstances, including evidence of the drug dog's satisfactory performance in its certification or training program, successful re-certifications, field performance accuracy record, and the officer's suspicions about defendant during the initial traffic stop, the Eighth Circuit concluded that "all the facts surrounding [the drug] dog's alert[s], viewed through the lens of common sense . . . would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." 743 F.3d at 1158 (quoting *Harris*, 568 U.S. at 1058). Thus, the drug dog's sniff was "up to snuff" and supported a conclusion that the officers had probable cause to conduct a search.

Here, applying the *Harris* framework, the Court agrees with Judge Roberts that all the facts surrounding Lara's alerts (*before* her final indication), viewed through the lens of common sense, would not make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. Unlike in *Holleman*, the totality of the circumstances in this case do not support a conclusion that the government had probable cause to conduct a search. This is a close case, and the Court examines all relevant considerations in turn. First, it is undisputed that Lara is certified by the National Tactical Police Dog Association and trained to conduct article and drug searches. Each search has a separate command. Lara is trained, upon command, to go to the strongest source of the odor. After Lara locates the strongest source of the odor, Lara is trained to give a final indication by sitting or assuming a down position. It is also undisputed that Lara

13

engaged in several pre-indication changes of behavior. Lara engaged in the following pre-indication changes of behavior:

> closed-mouth breathing followed by an aggressive or quick pull toward the front grille of the suspect vehicle where Lara began to sniff. Officer Smith then noticed Lara snap her head back toward the driver's side of the vehicle. Officer Smith testified, based on his observations during drug searches, that the snapping was caused by her efforts to return to a 'scent cone' she had left. When Lara reached the driver's wheel well area, Officer Smith noticed 'a very aggressive sniffing pattern, closed-mouth sniffing pattern' which was inconsistent with her normal breathing through her mouth. Lara then progressed beyond the vertical door seam between the driver's side front and rear doors. Lara's head then snapped back again, this time up and to the left. Officer Smith described the snap as an effort 'to find the strongest source of odor.'

(Doc. 46, at 6) (cleaned up). In *Holleman*, the drug dog gave two *definitive* "alerts" before giving a trained final indication. 743 F.3d at 1157. Here, the Court recognizes that Lara engaged in several alerts or changes of behavior, described above, before giving a trained, final indication. There is no dispute, however, that Lara's pre-indication changes of behavior are not trained behaviors. The Court agrees with Judge Roberts that "it strains credulity to suggest that [Lara's] untrained responses prior to putting her nose in the window are an adequate substitute for the trained indication or that those responses . . . were, in fact, divorced from the indication that occurred after the unconstitutional intrusion in assessing probable cause." (Doc. 46, at 28). Also, Officer Smith testified that he does not recall ever authorizing a search based on Lara's behavior short of a final indication of sitting or lying down. Here, unlike in *Holleman*, Lara did not engage in definitive alerts before giving a trained, final indication, and Officer Smith's testimony does little to support the government's objection.

Also, in *Holleman*, the officers had several suspicions about defendant during the initial traffic stop. *See* 743 F.3d at 1157 (explaining that the defendant failed to open their window more than one inch when approached, hesitantly answered where they were

14

going, stated an occupation that was inconsistent with earlier statements, and displayed nervous energy). But here, the government's suspicions about defendant during the initial traffic stop do not rise to that same level. The government contends that defendant was shaking during the initial traffic stop; however, defendant denied that he was shaking, and the alleged shaking is not visible on the body camera footage. The government also contends that a hint of the smell of marijuana was present. The officers, however, admit that it was difficult to pinpoint the source of the smell due to passing cars and nearby apartments. Thus, the government's suspicions about defendant during the initial traffic stop do not rise to the same level of suspicion in *Holleman*.

For these reasons, based on the totality of the circumstances, the Court agrees with Judge Roberts that Lara's sniff was not "up to snuff" under the *Harris* framework and did not support a conclusion that officers had probable cause to conduct a search before Lara's physical intrusion or trespass into defendant's open vehicle window.

Consequently, the Court **overrules** the government's objection.

### C. *Issues Raised by Mr. Potter*

Neither party objected to Judge Roberts' legal conclusion that defendant waived the issue of Officer Smith and Lara's training because the motion was untimely under Federal Rule of Criminal Procedure 12(c)(3) and failed to show good cause for failing to timely raise this issue. The Court has done its own research and examination of this matter and agrees with Judge Roberts' findings and conclusions. Thus, the Court need not address this issue. The Court does, however, recognize Mr. Potter's concern that Lara's untrained, pre-indication behaviors could be a natural response to other stimuli and thus are an inadequate substitute for Lara's trained final indication. The Court factored this concern into its probable cause analysis. As stated previously, the Court agrees with Judge Roberts that this concern detracts from a finding that the police officers

15

had probable cause to conduct a search before Lara's physical intrusion or trespass into defendant's open vehicle window.

### D. Whether the Exclusionary Rule Applies

Defendant objected to Judge Roberts' legal conclusion that, despite the illegality of the vehicle search, the exclusionary rule does not apply. (Doc. 54). The Court has done its own research and examination of this matter and agrees with Judge Roberts' findings and conclusions.

In *Davis v. United States*, the Supreme Court held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." 564 U.S. 229, 232 (2011). Although the Eighth Circuit called the *Lyons* decision into question in *Pulido-Ayala*, 892 F.3d 315, the *Lyons* decision has never been overruled. "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system.'" *Id.*, at 240 (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)) (alteration in original).

As in *Davis*, the conduct of the officers here was neither deliberate nor culpable. Defendant's objection focuses on *Buescher*. 2023 WL 5950124. In *Buescher*, this Court applied the exclusionary rule to suppress evidence because the drug-sniffing dog in that case was trained to enter the open windows of vehicles. *Id.*, at *10. The Court is mindful of defendant's argument that "Lara's uncorrected, repetitive practice of invading protected property makes Officer Smith's conduct culpable" (Doc. 54, at 3); however, this conduct is not culpable enough to trigger the harsh sanction of exclusion. The Court agrees with Judge Roberts that the police officers in this case did not violate defendant's Fourth Amendment rights deliberately, recklessly, or with gross negligence. Also, although called into question by the Eighth Circuit, *Lyons* remains good law, and a reasonable officer could rely on *Lyons'* holding: "Absent police misconduct, the

16

instinctive actions of a trained canine do not violate the Fourth Amendment." *Lyons*, 486 F.3d at 373; *see Davis*, 564 U.S. at 241 ("Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.").

Thus, the Court **overrules** defendant's objection on this ground.

### V. CONCLUSION

For these reasons, defendant's objection is **overruled**, the government's objections are **overruled-in-part** and **sustained-in-part**, Judge Roberts' R&R (Doc. 46) is **adopted-in-part**, and defendant's Motion to Suppress (Doc. 21) is **denied**.

**IT IS SO ORDERED** this 9th day of April, 2024.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa